## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ESSOCIATE, INC. | |
| Plaintiff, | **CASE NO. 11-cv-727-bbc** |
| v. | |
| AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC., SOCIAL ASSETS LLC d/b/a KINETIC SOCIAL, and DOES 1–10, | |
| Defendants. | |

### EXPERT REPORT OF MICHAEL LANDAU

I, Michael Landau, the undersigned, declare:

### I.      Qualifications

I am the Chief Technology Officer of Plaintiff Essociate, Inc. I have over 18 years experience in information technology systems, including without limitation cutting-edge affiliate marketing services. I am a co-founder of Essociate and have developed and patented a novel system, method, and computer program for affording virtual affiliates access to an existing affiliate system. I have a B.S. degree in Economics and a minor in Computer Science from the University of California, Berkeley.

I have not authored any publications in the previous ten years. I have not testified as an expert at trial during the previous four years. I have testified at depositions twice in the previous four years, in the above-captioned case and in *Essociate v. ClickXChange Corp. et al.*, U.S.D.C. C.D. Cal. Case No. SACV09-536-JVS (MLGx).

### II.      Opinions

My opinions are as follows:

ES-CRAK 005243

1.      A person having ordinary skill in the art at the time of the invention of the '660 Patent would have been a web developer experienced with web-development technologies such as HTML, Apache, CGI, Cold Fusion, and scripting languages such as Javascript, Perl, and other similar languages commonly used in web development.

2.      Kent's opinions about Epic's proposed constructions are inappropriate. Unlike the constructions proposed by Essociate, they are neither consistent with the '660 Patent nor with the meaning of those terms in the art.

3.      The "Old Xpays" system neither anticipates nor renders obvious the invention disclosed in the '660 Patent.

4.      None of the other prior art or combinations of prior art discussed in the Kent Report, with or without Old Xpays, would render the invention disclosed in the '660 Patent as obvious.

## III.      Expert Report

### A.      Identification of a person having ordinary skill in the art

I agree with Essociate's proposed definition of a person having ordinary skill in the art at the time of the invention of the technology disclosed in the '660 Patent: a web developer experienced with web-development technologies such as HTML, Apache, CGI, Cold Fusion, and scripting languages such as Javascript, Perl, and other similar languages commonly used in web development.

Kent's definition is inappropriate for several reasons. First, it significantly overstates the level of the art at the time of the invention in the '660 Patent. At the time of the invention of the '660 Patent, *i.e.* early 1999, a person having ordinary skill in the art would not have had experience in "designing Internet affiliate systems." (Kent Report at

- 2 -

ES-CRAK 005244

28.) At that time, there were a very limited number of individuals with experience in "designing Internet affiliate systems." Such individuals would have been exceptional, not "ordinary."

Second, Kent provides no basis for his assumption that there is a field of art in "designing Internet affiliate systems." Based on my experience, I do not believe that such a field existed at the time of the invention of the '660 Patent. It may be the case that a field of art existed for "implementing Internet affiliate programs," but Kent's definition appears calculated to include unusually creative individuals, not the actual, "ordinary" persons who would have implemented affiliate-system designs such as the one disclosed in the '660 patent.

Third, the list of qualifications Kent identifies for one of skill in the art do not support his proposed definition. His list of qualifications, like Essociate's proposed definition, is primarily technical in nature. There is no indication that simply possessing those technical skills, plus his addition of having "an understanding … of Internet affiliate marketing," would result in a person with skill in "designing Internet affiliate systems." I do not believe that those qualifications would, collectively, result in a person having skill in the art of "designing Internet affiliate systems."

**B.     Responses to Kent's proposed claim constructions**

I have reviewed the '660 Patent and the proposed claim constructions of both Essociate and Epic. Based on my experience in the online affiliate marketing industry, I disagree with Kent's proposed constructions and the alleged bases for those constructions to the extent he has identified any such bases and not merely stated a conclusion.

ES-CRAK 005245

1.    "Correlating"

Essociate proposes that the term "correlating" be construed to mean: "Creating or recognizing a relationship between." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification. Epic's proposed definition, "to establish a mutual or reciprocal relationship between," is too narrow and rejects the possibility that a correlation occurs upon recognition of an existing relationship.

In the '660 Patent, the word "correlate" means to create or recognize a relationship:

> From the request, the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source webmaster ID) can then be **correlated** to a unique ID for the Merchant's affiliate system (target webmaster ID).

('660 Patent at col. 10, ll. 63-67, emphasis added.) The paragraph immediately preceding the above quote indicates that "[r]ecognition of the source system can occur via an identifier (source system identifier) in the URL request that is received by the affiliate pooling system." ('660 Patent at col. 10, ll. 57-59.) The identification of the source in the URL request allows the system to recognize which merchant is the target of the request— thus, the system creates or recognizes a relationship between the source webmaster ID and the target webmaster ID.

Additionally, there is no basis for Epic's requirement that "correlating" requires "establishing" a relationship. The specification of the '660 Patent discloses various examples of ways in which correlation may occur. One of those ways is by using a "lookup table that cross-references the two codes." (*See* '660 Patent at col. 11, ll. 1-12.)

- 4 -

ES-CRAK 005246

This is correlation, as the term is used in the '660 Patent and it is consistent with my understanding of how that term would have been understood in this context in the art at the time of the invention.

### 2.    "Unique identification system"

Essociate proposes that the term "unique identification system" be construed to mean "a system for using unique identification information to identify at least one webmaster in an affiliate system." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

In contrast, the support provided in the Kent Report for Epic's proposed construction is not even consistent with the '660 Patent. Kent claims that because the '660 Patent includes the "concept of the 'unique identification system' of the target Merchant affiliate system," that "Epic's proposed construction therefore reflects the concept of assigning 'unique identifiers' to webmasters in an affiliate system better than Essociate's proposal." (Kent Report at 19.) But the claims of the '660 Patent only contemplate "assigning" unique identifiers to webmasters in a source affiliate system, not in a target affiliate system. So Kent's proposed criteria for preferring Epic's definition are irrelevant.

Kent does not identify the basis for any other differences between Epic's proposed construction and Essociate's, so I am unable to determine the basis upon which his opinion about those differences is based, if any.

ES-CRAK 005247

### 3.      "Target Webmaster unique identifier"

Essociate proposes that the term "Target Webmaster unique identifier" be construed to mean "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

In contrast, Epic's proposed construction is ambiguous and inconsistent with the '660 Patent. The "correlation" which occurs in the '660 Patent—even under Epic's faulty proposed construction—indicates that each target Webmaster unique identifier is assigned to one of the source Webmasters. Kent is correct that the invention provides "virtual affiliates" to a target affiliate system, but he overlooks that that functionality is made possible by assigning a target Webmaster unique identifier to each of the source Webmasters. Without that assignment, which Epic's proposed construction ignores, there can be no virtual affiliates.

### 4.      "Configuring an existing target affiliate system"

Essociate proposes that the term "configuring an existing target affiliate system" be construed to mean "a data setup operation relating to a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

ES-CRAK 005248

Epic does not appear to dispute Essociate's construction of "configuring an existing target affiliate system." Instead it proposes a different construction for the underlying term "target affiliate system" as "a merchant affiliate system to which virtual affiliates can refer traffic."

But Epic's proposed construction of "target affiliate system" is inconsistent with the '660 Patent. Rather, a target affiliate system can be described as "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." This construction is consistently supported by the specification:

> "Most Merchants currently utilize some form of affiliate system to increase sales, track traffic, and compensate Webmasters for referrals of traffic and/or transactions". ('660 Patent at col. 2, ll. 8-10.)

> "the Merchant retains full access to and control of its affiliate system"). (*Id.* at col. 2, ll. 49-50.)

> "a user (i.e. traffic of the Webmaster from the affiliate pool) clicks a URL (on the Webmaster's web site) which . . . identifies the target Merchant system whose products or services are being advertised". (*Id.* at col. 10, ll. 33-37.)

> "the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source webmaster ID) can then be correlated to a unique ID for the Merchant's affiliate system (target Webmaster ID)". (*Id.* at col. 10, ll. 63-67.)

Each of those references in the specification supports Essociate's proposed construction and are consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

### 5. "Generating a URL"

Essociate proposes that the term "Generating a URL" be construed to mean "causing a URL to appear in a user's web browser without a further user request." In my

ES-CRAK 005249

opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

Epic is incorrect that this term does not require construction, as it has specific meaning ascribed to it in the '660 Patent in the context in which it appears. The '660 Patent specification expressly describes the return of a URL which enables a user to access the target Merchant's existing affiliate system without a further user request:

> In a new URL determination operation **612**, a new URL is determined based on the target Merchant and the target Webmaster ID. Once the correlated ID number for use by the target Merchant affiliate system is determined by the lookup function, **the system returns a new URL, containing the "looked up" code and acting as an entry mechanism into the target Merchant's existing affiliate system.** The format of the URL (i.e., syntax for the location of the target Merchant affiliate system) is determined using the configuration information specified during a data setup operation, as described in greater detail above. **At this point, the user (traffic) is handed to the Merchant**, and the transaction is then either completed or abandoned.

('660 Patent at col. 15, ll. 29-41, emphasis added).

### 6. "Correlated target webmaster unique identifier"

Essociate proposes that the term "correlated target webmaster unique identifier" be construed to mean "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System for which a relationship has been created or recognized with a source webmaster identifying code." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

ES-CRAK 005250

Kent claims that this term does not require construction. He is correct insofar as Essociate's proposed constructions of "correlating" and "target Webmaster unique identifier" are adopted.

### 7. "Source webmaster unique identifier"

Essociate proposes that the term "source webmaster unique identifier" be construed to mean "a unique identifying code assigned to a webmaster within an affiliate pool of source webmasters." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

The plain language of the '660 Patent indicates that a source webmaster unique ID is a code that uniquely identifies a webmaster within an affiliate pool of such webmasters (*i.e.*, "source webmasters"). Essociate's proposed construction accurately reflects this meaning. But according to Kent, Epic's proposed construction would require that each source webmaster be assigned <u>only one</u> such unique code. That construction is not supported in the specification, and any person of ordinary skill in the art would recognize that there is no basis for that limitation. Nor is there any support for Kent's claim that Essociate's proposed construction would "include the situation where a code could be assigned to a webmaster in an affiliate system, but potentially could be reused." (Kent Report at 21.) That is simply not consistent with Essociate's proposed construction, and Kent does not explain how it could be.

### 8. "Referring webmaster"

Essociate proposes that the term "referring webmaster" be construed to mean "a webmaster from which traffic is directed." In my opinion, this is consistent with the

- 9 -

meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

Kent claims that this term does not require construction because the term is readily understood in the context of the claims of the '660 Patent. Kent is correct to the extent his "readily understood" meaning is synonymous with Essociate's proposed construction. To the extent he opines that it has any other meaning, there is no basis for such a meaning provided in his report and I am unable to evaluate it.

### 9.    "Merchant affiliate system"

Essociate proposes that the term "merchant affiliate system" be construed to mean "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

Epic's proposed construction is far too narrow in the context of the '660 Patent or in the context of online affiliate marketing in general. Epic would limit this term by requiring that it only apply to a "complete system" and that it not apply to "pay-per-click traffic." But, as used in the '660 Patent, the term "merchant affiliate system" is essentially synonymous with an "existing target affiliate system," which is discussed above ("configuring an existing target affiliate system"). Like "existing target affiliate system", a "merchant affiliate system" can be described as "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant".

Additionally, the '660 Patent does not require that the merchant affiliate system perform its tracking mechanisms for the purpose of determining compensation—it merely

ES-CRAK 005252

requires the performance of "requisite tracking" ('660 Patent at col. 22, ll. 7-8) which is
not limited to only being used to determine compensation. And there is no reason why
"merchant affiliate system" would not apply even to a system in which affiliates sent
traffic "gratuitously" or on a "pay-per-click" basis—indeed, the independent claims of
the '660 Patent do not require that any compensation be provided to the source
Webmaster.

### 10.   "Virtual affiliates"

Essociate proposes that the term "virtual affiliates" be construed to mean
"webmasters who direct traffic to one or more merchants via the placement of links to
merchant websites on the webmasters' websites, but who are independent from the
merchants' own affiliate systems." In my opinion, this is consistent with the meaning that
claim term would have had to a person of ordinary skill in the art at the time of the
invention in the context of the '660 Patent, including its specification.

Essociate's proposed definition for this term closely tracks the language of the
specification: "Most Merchants currently utilize some form of affiliate system . . . the
Webmaster directs traffic to given Merchants via their selection and placement of
Merchant links" ('660 Patent at col. 2, ll. 8-16); "The Virtual Affiliate remains
independent from the Merchant's affiliate system." (*Id.* at col. 7, ll. 50-51.)

Epic's proposed construction is too limiting insofar as it requires the referring
virtual affiliate to remain anonymous to the merchant's affiliate system. Anonymity is
expressly identified as an optional feature in the specification:

> The Virtual Affiliate remains independent from the Merchant's affiliate
> system. In addition, the Virtual Affiliate may remain anonymous to the
> Merchant's affiliate system, identified only as a member of the affiliate
> pool of Webmasters 306, as described in greater detail subsequently.

ES-CRAK 005253

(*Id.* at col. 7, ll. 50-54 (emphasis added); *see also id.* at col. 9, ll. 43-44: ("This possibility for anonymity…"). The '660 Patent identifies anonymity as one possible benefit of the disclosed technology, but it is not a limitation on the scope of the claims.

### 11.    "Existing target affiliate system"

Essociate proposes that the term "existing target affiliate system" be construed to mean "an existing system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification. My additional analysis of the term "target affiliate system" appears above in connection with the term "configuring an existing target affiliate system."

### 12.    "Stored transaction information"

Essociate proposes that the term "stored transaction information" be construed to mean "stored data associated with transactions." In my opinion, this is consistent with the meaning that claim term would have had to a person of ordinary skill in the art at the time of the invention in the context of the '660 Patent, including its specification.

In contrast, Epic's proposed construction is overly narrow. It would restrict the meaning of this term to include only information that is "used to determine the affiliate's commission." But the specification supports Essociate's proposed definition. (*See* '660 Patent at col. 3, ll. 27- 33 (a back-end tracking mechanism keeps track of transactions and credits affiliates); *Id.* at col. 12, ll. 26-31 (information may include "relevant transaction data, such as a transaction date, a transaction amount, an order number, customer information, product information, and so on"). Kent does not identify any reason why this

ES-CRAK 005254

term should be limited as Epic proposes. Rather, his conclusion appears to be drawn entirely from an observation that the "transaction information" is obtained from the target Merchant affiliate system. But that does not support his conclusion that the "transaction information" is limited to commissions.

### 13.   "Affiliate"

This term is well-understood in the art, and was at the time of the invention of the '660 Patent, and does not require construction. Epic's proposes that this term be construed to mean: "a website that refers traffic to a merchant's website in exchange for a commission on completed transactions." This construction is far too narrow because it does not include affiliates who receive a commission based on a "pay-per-click" compensation model or other well-known affiliate compensation structures.

### 14.   "Requisite tracking"

Epic's proposed construction of this term is overly complicated and inconsistent with the '660 Patent. All this term refers to is any tracking required by any entity which needs tracking—including the virtual affiliate pool or the target Merchant affiliate system. The specification explains that there are several reasons for a merchant to require tracking, only one of which is to determine compensation. ('660 Patent at col. 2, ll. 1-7.) That tracking might include, for example, the tracking of traffic sources for statistical purposes, which is a common practice for online merchants.

### 15.   "Merchant unique identifier"

Epic's proposed construction of this term requires that a unique code be "assigned to a virtual affiliate." Kent does not explain any basis for the requirement that this term must be "assigned." I am unable to identify any support for that construction in the '660

ES-CRAK 005255

Patent and see no basis for that construction within the meaning that claim term would have to one skilled in the art, at the time of the invention or otherwise.

### C.   Issues with Claims 15 and 28

Kent concludes that Claims 15 and 28 are invalid because they are means-plus-function claims but fail to disclose a "structure" in the specification that would perform the claimed functions. I believe that Kent's analysis is faulty and I disagree with his conclusion.

Specifically, I see no basis for Kent's conclusion that "the '660 patent does not disclose the algorithm or code that could perform the 'correlating' step in claims 15 and 28." (Kent Report at ¶ 97.) In fact, the '660 Patent expressly discloses at least three structures capable of performing this step: (1) a "lookup table" ('660 Patent at col. 11, ll. 5-12); (2) a "hybrid string" of characters (*id.* at col. 11, ll. 13-24); and (3) with "custom interfaces" (*id.* at col. 11, ll. 26-37). In my opinion, each of those structures are sufficiently described in the specification, read in context with the rest of the specification and the claims, for one of skill in the art to readily understand the limitations on the claims. And, despite his stated conclusion in this section, Kent does not appear to have any difficulty identifying these structures. Elsewhere in his report he expressly identifies these structures and analyzes their functionality in detail. (*See, e.g.*, Kent Report at ¶¶ 128–170.) Additionally, in contradiction to his conclusion in this section, Kent's opinion later expressly claims that one of skill in the art would "recognize that these scripting platforms would allow the virtual affiliate system to create a template that could, in response to a user request originating from a particular source webmaster,

- 14 -

ES-CRAK 005256

incorporate the source webmaster ID into a URL for the target affiliate system." (*Id.* at ¶ 131.)

Finally, to the extent that Kent is of the opinion that other steps in claims 15 or 28 lack a corresponding structure in the specification, I am unable to rebut his conclusion specifically because he has provided no basis or reason for that opinion. But it is my opinion that for each of the "code segments" in claim 15 and its dependent claims and each of the "means" in claim 28, the specification identifies a structure sufficient for one of skill in the art to readily determine the extent of the claimed invention.

**D.     The "Old Xpays" method does not anticipate the '660 Patent**

**1.     Kent's description of the Old Xpays system is flawed.**

Kent's opinion relies on a flawed analysis of the Old Xpays system and its underlying technology. As a result, I believe his conclusions about that system are deeply flawed.

Before the development of the technology disclosed by the '660 Patent, the inventors of the '660 Patent utilized another method for participating as an affiliate hub within a merchant affiliate system. They did so in connection with another company, Xpays, LLC, which Kent incorrectly refers to as "Xpays, Inc."

XPays practiced several forms of the prior art affiliate services. For example, XPays provided affiliate services to a company called Netfill. Kent describes Netfill as a "merchant affiliate system," (Kent Report at ¶ 108) but he is mistaken. Rather, XPays operated as an "Internet affiliate service bureau" in connection with Netfill which Kent defines as a service provided to "e-commerce merchants that did not want to build their own affiliate networks." (*Id.* at ¶ 34.) Deposition testimony confirms this: "Netfill had a

ES-CRAK 005257

string of sites which did not have their own affiliate program and we basically ran the structure of their affiliate program until they went out of business in early – early 1999." (2010 Landau Dep. 73:2–73:17.)

Kent further states that "the system that Xpays operated in 1998 also worked as a virtual affiliate system…it contained a mechanism by which it could interface with other affiliate systems, allowing XPays affiliates to send visitors to merchants outside the XPays affiliate network; that is, to merchants that ran their own affiliate programs" (Kent Report at ¶ 110; *see also id.* at ¶ 113.) This is false and there is no support for this conclusion in any of the materials cited in the Kent Report.

Then, starting in early 1999, Xpays provided its affiliates access to merchant affiliate systems associated with the websites operated at igallery.com ("iGallery") and python.com ("Python"). iGallery's and Python's merchant affiliate systems each assigned an affiliate ID to XPays. But they did not assign XPays any sub-ID's or additional affiliate codes which could be used to track XPays affiliates. Nor is there any evidence that those merchant systems had the ability to do so. Kent claims that those websites "did not need or want to use the XPays affiliate system" but he does not identify any support for that conclusion about the preferences of those third parties. (Kent Report at ¶ 111.)

In order to track its affiliates, XPays manually built and hosted a webpage for each XPays affiliate that participated in the iGallery campaign. When an XPays affiliate enrolled with XPays to participate in the iGallery campaign, XPays would manually build and host a web page for that affiliate to participate in that campaign (an "Intermediate Page"). The Intermediate Page needed to be specifically created for each Xpays affiliate so that the links in it would include the Xpays five digit code for that affiliate, which

ES-CRAK 005258

might have looked like <http://www.igallery.com/affiliates/XPays/12345>, where the code assigned to Xpays by iGallery was "Xpays" and the code Xpays assigned to a particular Xpays affiliate was "12345." For each Xpays affiliate desiring to participate in the iGallery campaign, Xpays would provide that affiliate with a URL to place on the affiliate's own webpage which would link to the Intermediate Page specific to that affiliate, which might have looked like <http://www.XPays.com/igallery/12345>.

When a visitor to that XPays affiliate's website clicked on the URL for the Intermediate Page, the visitor's browser was directed to the Intermediate Page hosted by Xpays. Kent incorrectly states that "Old XPays affiliates could use the Old Xpays system to send their site visitors to an iGallery web site." (Kent Report at ¶ 118.) That was not possible under Old Xpays; rather XPays affiliate could only send visitors to the Intermediate Page. Once they arrived at the Intermediate Page hosted by Xpays, the visitor had the option to click on another link which would then take the visitor to iGallery's website. If the visitor then purchased a subscription to iGallery's website, iGallery credited XPays with the transaction.

In connection with iGallery and Python, XPays was able to determine which of its affiliates were responsible for a particular commission because it inserted the Xpays code for each affiliate into the link sent to that affiliate. But there is no reason to believe that that five-digit code had any functionality within either iGallery's or Python's system. Kent incorrectly states that "Old XPays affiliates could use the Old Xpays system to send their site visitors to an iGallery web site, and be tracked by the iGallery affiliate system." (Kent Report at ¶ 118.) But there is no indication that iGallery performed such tracking or had the ability to do so. Rather, the only code ever accepted by or functional within those

- 17 -

systems was the code for XPays itself (*e.g.* "Xpays"), which was unique to XPays but the same for each XPays affiliate participating in those campaigns.

### E.    The Old Xpays system does not invalidate the '660 Patent.

Kent claims that the Old Xpays system practices the invention claimed in the '660 Patent and therefore invalidates it. I disagree. The Old XPays system has numerous material differences from the technology disclosed in the '660 Patent and Kent's attempt to show otherwise is based on serious misunderstandings (or mischaracterizations) of the Old Xpays system.

As an initial matter, Kent is incorrect in his conclusion that the Old Xpays system reflects an embodiment of the '660 Patent for at least four reasons.

First, there is no indication that the <xmake.cgi> file was used in connection with the iGallery or Python campaigns. As Kent notes, the date on that file is from November 1998. (*See* Kent Report at ¶ 113.) But at that time, XPays was only providing "affiliate service bureau" services to Netfill. And Netfill did not operate its own merchant affiliate system to which "virtual affiliates" could be provided by XPays. Additionally, the xmake.cgi file itself contains a reference that confirms it was only used on the XPays server used in connection with Netfill services, and not services provided in connection with Python or iGallery.

Second, Kent's modified Figure 3 (Kent Report at ¶ 117) and his analysis of that modified figure are misleading. He appears to assume that any "virtual affiliate system" is equivalent to the invention disclosed in the '660 Patent. (*Id.* at ¶ 118.) This is incorrect; the '660 Patent claims a specific kind of virtual affiliate system, with critical features not present in Old Xpays. Specifically, Kent's modified Figure 3 discards or ignores any

ES-CRAK 005260

reference to the correlation between the unique codes used by the source pool of webmasters and the merchant affiliate system. As I discuss further below, the Old XPays system lacked such correlation and did not use unique codes functional within the merchant affiliate system as required by the '660 Patent.

Third, Kent relies heavily on several diagrams prepared by Epic's counsel and Kent. (*See* Kent Report at ¶¶ 119-122). But these diagrams are misleading. They only depict the existence of relationships among the participants in a virtual affiliate system (*i.e.* the affiliates, the affiliate pool, the merchant affiliate system, and the merchant's other affiliate). But the '660 Patent does not claim an invention in the existence of those participants, but rather in a novel way of facilitating transactions among them. Additionally, Kent's "relationship" diagrams (*see id.* at ¶¶ 119, 120) are confusing—it is difficult to understand why the various participants are laid out in the way they are. Kent's attempt at clarifying this is not helpful. The "route" diagram at Paragraph 122 of the Kent Report is meaningless, it does not show the direction of the traffic and conflates the relationships between the various parties with the route of the "traffic."

Fourth, Kent's relabeling of Figure 123 from the '660 Patent is also misleading and ascribes several characteristics to the Old XPays system which did not exist. For example, Kent has labeled step 508, the "correlation step," as "XPays receives a request from a visitor to the affiliate site, determines the source affiliate by examining the ID, and then correlates the source ID to an ID that is functional within the target system." (Kent Report at ¶ 123.) But Old Xpays did not include a correlation in which unique source IDs were correlated to unique target IDs functional in the merchant's system. Kent's labeling of step 509, the "hand off" step is also flawed. Old XPays did not "forward the visitor to

ES-CRAK 005261

the target merchant system" in response to "a request from a visitor to the affiliate site." Rather, a visitor would not have been forwarded to the merchant in response to that request, but would have been only directed to an Intermediate Page (hosted by XPays, not the merchant).

Kent is also incorrect that the Old XPays system included the "correlation" step disclosed in the '660 Patent. (*See id.* at ¶¶ 126–170.) The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The Old Xpays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated.

Kent is incorrect that the Old XPays system included the "hybrid string" structure for correlation disclosed in the '660 Patent. Kent claims that the URLs used in the Old Xpays system were generated by "concatenation." (*Id.* at ¶ 133.) This is clearly incorrect, and Kent's use of that term indicates he either does not understand that meaning of that term as used in the art or does not understand the functionality ascribed to Old Xpays. My understanding of that term as it is used in the art is consistent with the definition and example provided on the Wikipedia page for "concatenation": "In formal language theory and computer programming, string concatenation is the operation of joining two character strings end-to-end. For example, the concatenation of 'snow' and 'ball' is 'snowball'." (*See* http://en.wikipedia.org/wiki/Concatenate).

But the Old XPays system did not involve any URLs formed through concatenation. And none of the materials Kent claims to have reviewed, or with which I am familiar, indicate otherwise. Rather, it is clear that the xmake.cgi script—even assuming that was used in connection with iGallery and Python, which does not appear to

ES-CRAK 005262

be the case—operated by substitution. That script substituted a placeholder, <!--ASJCGI--> with the 5-digit code for a particular Xpays affiliate. (Kent acknowledges this functionality later in his opinion. (*See* Kent Report at ¶ 145.)) There was no concatenation.

But the hybrid string structure for correlation disclosed in the '660 Patent refers to the creation of codes, not URLs: "the Merchant affiliate system may also use a hybrid string of characters as a target Webmaster ID for identifying Webmasters associated with the affiliate pooling system." ('660 Patent at col. 11; ll. 13-15.) There was no creation of a "target Webmaster ID" in the Old Xpays system (by concatenation or otherwise). Kent noticeably avoids any discussion of the use of a target Webmaster ID and instead focuses on the creation of URLs.

Kent's conclusion about the functionality of the Old XPays system is incorrect and not supported. He claims that in that system, the merchant affiliate system "recognize[d] the new target Webmaster ID such that the Merchant's existing tracking can take over." (Kent Report at ¶ 136.) But there were no "new target Webmaster IDs" in Old XPays. And there is no indication whatsoever that the 5-digit Xpays affiliate code that XPays included in URLs was recognized in any way by either Python or iGallery, much less "tracked" by either of those systems.

Kent's description of the Landau testimony on this issue is false. (*See* Kent Report at ¶ 138). He claims that Landau testified that the affiliate ID provided to XPays would be "the first part of the code used by the target affiliate system" and provides two deposition citations in support of that position (*Id.*) But in the first testimony Kent cites, Landau identified the string "81193000025" only as an "11-digit string," and never as a

ES-CRAK 005263

"code used by the target affiliate system." (*See* 2010 Landau Dep. at 67:10-17). And in the second passage of testimony, in direct contradiction to Kent's characterization of this testimony, Landau testified that the appearance of "811930" was probably the identifier for XPays within the iGallery system, but that he was not sure because "I'm not totally familiar with how this system on the other hand worked for them [iGallery]." (2012 Landau Dep. at 137:19-24.) Nowhere else in the passage Kent cites does Landau ever state or imply that the affiliate ID provided to XPays was "the first part of the code used by the target affiliate system" as Kent claims. I am unaware of any support whatsoever for Kent's statement that the code assigned to XPays by Python or iGallery "would be the first part of the code used by the target affiliate system." (Kent Report at ¶ 138.)

Kent's attempt to apply the hybrid-string structure disclosed in the '660 Patent to Old XPays is also flawed. For example, Kent claims that the merchant's server used the entire example string "raw_81193000025" (in which the Xpays affiliate's code was substituted as "00025") was used to "assist in transaction tracking" or used as the "tracking or affiliate ID." (*Id.* at ¶ 152.) There is no basis for Kent's conclusion that Python or iGallery used the entirety of that string for anything, whether for tracking or as an affiliate code. Kent's only support for this conclusion appears to be a reference to testimony from the 2010 Landau deposition. Kent claims that Landau testified that "raw_81193000025" was an "affiliate ID." (*Id.* at 146.) To the contrary, in the passage of testimony Kent cites, Landau identified the string "81193000025" only as an "11-digit string," and never as an "affiliate ID." (*See* 2010 Landau Dep. at 67:10-17). I do not believe that Python or iGallery used that string for tracking or as an affiliate code.

ES-CRAK 005264

Additionally, I believe that Kent's analysis of the "user request" step is irreconcilably flawed because it is internally inconsistent. He claims that both (i) that it occurs when "[t]he visitor's browser sends a request for the Intermediate Page [hosted by XPays] to the Xpays server," (Kent Report at 150) and (ii) that it is something "sent to the target merchant" (*id.* at ¶ 153). It is not possible that these refer to the same "request."

Kent's attempt to map the concept of "target Webmaster ID" onto Old XPays is also internally inconsistent and flawed. He invents a new term, the "primary target-merchant affiliate ID" by which to refer to the code assigned to XPays, *i.e.* raw_811930. (*Id.* at ¶ 158.) But the '660 Patent contains no such distinction. It refers to target Webmaster unique identifiers which are correlated to source Webmaster unique identifiers. The code assigned to XPays, raw_811930, may have been unique, but that was never correlated to any of the source webmaster IDs assigned to Xpays affiliates. And the URLs created through substituting the string <!--ASJCGI--> with a particular XPays affiliate, are not target Webmaster unique identifiers.

More importantly, this new "primary target-merchant-affiliate ID" is inconsistent with Kent's previous description of the target Webmaster IDs as strings including both the affiliate ID assigned to XPays and the 5-digit Xpays affiliate ID. (*See* Kent Report at ¶ 136). In truth, neither version of Kent's analysis indicates that Old Xpays was an embodiment of the '660 Patent. On the one hand, if the ID assigned to XPays is the target Webmaster ID, then there is no "correlation" between that ID and the source webmaster IDs assigned to XPays affiliates—it is always the exact same value for every source webmaster. On the other hand, if he claims that the target Webmaster ID is the entire 11-digit string then it is not functional within the target affiliate system.

ES-CRAK 005265

Also, Kent continues to demonstrate a misunderstanding of the basic functionality of the Old Xpays system. He claims that in Old XPays "the system takes the primary target-merchant affiliate ID—the affiliate ID assigned to XPays, by for instance, iGallery, and adds the XPays affiliate's ID to the end of it." (Kent Report at ¶ 158.) Here Kent has correctly used the term "concatenate"—*i.e.* the operation of joining two character strings end-to-end—but he applies it incorrectly. That is not the operation used in Old Xpays. Rather, in that system, an operation occurred in which a URL contained the placeholder <!--ASJCGI--> and that placeholder was replaced by a particular XPays affiliate ID. There was no "joining two character strings end-to-end." Additionally, Kent misunderstands the nature of the operation at issue. The string being modified by substitution was an entire URL. Kent is incorrect when he states that an ID was being modified, whether by "concatenation" or otherwise.

Kent's attempt to show that Old Xpays also practiced the "block of IDs" method is also flawed. (*See* Kent Report at ¶ 46). It is based entirely on a misstatement by Essociate's counsel in a confidential settlement letter in a previous lawsuit unrelated to Epic. There is no indication that Old XPays used a block of IDs method for any purpose, whether for correlating or otherwise. Kent claims that Landau confirmed that description during deposition, but the cited deposition testimony was largely irrelevant, it discussed a "block of links" not IDs (*See* 2012 Landau Dep. at 120-22-123:7). More importantly, in the testimony Kent cites, Landau expressly rejects the description: "I would say a block of links may not necessarily be the best way to phrase it." (*Id.* at 121:13-14.)

ES-CRAK 005266

**F.      Old Xpays does not render the '660 Patent obvious.**

Kent also concludes that, even if the Old XPays system did not practice all of the claims of the '660 Patent that it still invalidates it because the '660 Patent would have been obvious to one having ordinary skill in the art at the time of the invention of the '660 Patent in light of Old XPays. Additionally, I note that Kent also continues to conflate the idea of a "virtual affiliate system" in general and the specific invention disclosed in the '660 Patent. This makes me question his entire analysis because his opinion appears to be only that "One of skill in the art related to Internet affiliate programs, and knowledgeable of the prior art, would be able to create a virtual affiliate system without undue experimentation." (Kent Report at ¶ 171) This conclusion appears to be meaningless, as the '660 Patent does not claim all virtual affiliate systems.

I disagree with Kent and see no basis in his opinion, or otherwise, to conclude that the '660 Patent was an obvious improvement over the prior art. And although he has identified several additional prior art references in addition to Old Xpays, I am unable to understand any basis for his conclusions that one of ordinary skill in the art (even under his proposed definition of one skill in the art) would combine those references. He has not stated a basis for those opinions or any evidence that they would have been combined as he indicates, and I believe that his conclusions are simply incorrect.

Old Xpays itself would not have made the '660 Patent obvious. Old Xpays lacked the key features of the '660 Patent. For example, as discussed above, Kent is incorrect when he states that it included a correlation function. It did not—there was nothing that could be "correlated" within the meaning of the '660 Patent. Kent claims that "correlation functions" and "lookup functions" are "basic computing functions probably…dating back

- 25 -

ES-CRAK 005267

to 1944." (Kent Report at ¶ 174.) But this is not relevant—the '660 Patent does not claim the use of "correlation" in general, and Kent does not represent that the reference materials he cites disclose correlating unique affiliate IDs.

Furthermore, Kent's claim that using a lookup table to correlate source IDs and target IDs would be the "*first* method one would consider" (*Id.* at ¶ 175) is completely inconsistent with the actual development of the online affiliate marketing and the approach that would have been taken by one of skill in the art. The history of the development of online affiliate marketing indicates that the correlation of source IDs and target IDs, as claimed in the '660 Patent, did not become widely used until at least 2002 or 2003, after which time it quickly became the predominant form of technology practiced by online affiliate networks. More importantly, one of skill in the art would certainly have not considered using a lookup table "first." Using a lookup table is highly resource and time intensive and would generally be viewed as a suboptimal or inefficient solution to this kind of problem. More likely, it would have been the last solution that would have been tried. Kent's claim that it would have been considered first demonstrates a material lack of perspective as to what would have been contemplated by one of ordinary skill in the art at the time of the invention.

Additionally, while the Old Xpays system included source webmaster unique IDs (*i.e.* the Xpays affiliate IDs), it did not include target IDs which were functional in the target affiliate system. There is no basis to believe that Xpays' inclusion of its 5-digit affiliate IDs in the URLs it used in connection with either Python or iGallery had any meaning to those systems, much less than they were part of a "target Webmaster unique identifier" functional within those systems.

ES-CRAK 005268

### G. Old Xpays does not render the '660 Patent obvious in combination with any of the other prior art cited by Kent

Not only would the Old XPays method on its own not render the '660 Patent obvious, but it would not have done so even in combination with any of the other prior art references Kent discusses. Kent claims that the '660 Patent "is obvious over Old Xpays in light of Ross, Verma, and/or Graber, which disclose a correlating function that Essociate contends is the distinguishing function of New Xpays and the '660 Patent." (Kent Report at ¶ 178.)

Kent primarily relies on U.S. Patent No. 6,629,135 to Ross which describes a "Host" website which "links to selected products or product categories" offered by one or more Merchants. (Ross at col. 3, ll. 21-28; *id.* at col 4, ll. 4-6.)

> "Upon actuation of such a link by a visitor of the Host website, a page is presented to the visitor incorporating a replica of the Host's look and feel directed to the sale of the selected products or product categories."

(*Id.* at col. 4, ll. 6-9.) Kent characterizes Ross as including a "correlation function" with the "essential idea of correlating between the source system and the target system." (Kent Report at ¶ 176.)

But that is a material and misleading oversimplification—Ross is significantly different from the technology claimed in the '660 Patent. Ross does not disclose an existing target affiliate system, a source webmaster unique identifier (in the same sense as the '660 Patent), a target webmaster unique identifier, or a correlation of those identifiers as disclosed in the '660 Patent. To the contrary, Ross discloses "providing the host website with a link for inclusion within a page on the host website correlating the host website with a selected commerce object." (Ross at col. 26, ll. 31-33.) The '660 Patent does not claim correlating a "host website" and "selected commerce object."

ES-CRAK 005269

Nor does Ross seek to address the same problem solved by the '660 Patent. Rather, Ross is directed to the perceived problem of a Host losing traffic to a Merchant when the user navigates away from the Host's site to the Merchant's. (*Id.* at col. 3, ll. 1-4.) Ross describes a system wherein Merchants may create an account, log into it, and provide information regarding their products. (*Id.* at col. 9, ll. 12.) Similarly, Hosts may create and log into accounts which permit them to, *inter alia*, "generate links to merchant products." (*Id.* at col. 20, ll. 2.)

Finally, Ross does not disclose an existing target merchant affiliate system which receives traffic from virtual affiliates. It merely provides a method for participating hosts to offer merchants' products on websites that incorporate "a replica of the Host's look and feel." (*Id.* at col. 4, ll. 6-9.)

It is unclear from the Kent Report why he believes that one of skill in the art would have combined Ross with the Old XPays system. It is my opinion that the technology disclosed in Ross is sufficiently different that such a person would not have done so and that even if they had, that would still not make obvious the invention disclosed in the '660 Patent.

Kent claims that similar correlation functions are disclosed in U.S. Patent No. 6,243,750 to Verma and in U.S. Patent No. 5,717,860 to Graber ("Graber '860"). (Kent Report at ¶ 177.) I disagree with his conclusions about those references as well. They do not have the same functionality, are not addressed at the same (or similar) problem as the '660 patent, and there is no reason to believe that they would have rendered the '660 Patent obvious to one of skill in the art, whether in combination with the Old Xpays system or otherwise.

ES-CRAK 005270

Kent claims that Verma discloses a "correlation function" which is "quite similar to the block of IDs correlating method in the '660 patent." (Kent Report at ¶ 191.) But Verma primarily discloses a technology for URL tracking. Kent describes Verma as explaining that "a wide variety of URL tracking techniques were known to those of skill in the art as of 1998." (*Id.* at ¶ 190.) It is unclear why Kent believes one of skill in the art would find the '660 Patent obvious in light of "URL tracking techniques" in general, especially when such tracking techniques are disclosed in the context of the background of the invention in the specification of the '660 Patent. He does not identify the basis for this opinion, and I disagree with this conclusion.

The "correlation function" in Verma to which Kent refers is actually a "comparing step" which compares "referring nodes" and "advertising nodes." (*Id.* at ¶ 191.) Those "nodes" refer to network addresses, not unique webmaster IDs used in connection with affiliate networking:

> Briefly, in accordance with the invention, in a network comprising a plurality of nodes wherein each node is identified by a unique address and each node comprises the capability for including sub-addresses, a method for determining a referring entity for an access request for a node in a network, comprises the steps of: receiving a request for an address in the network, the request including a request for a sub-address within the node identified by the address; removing the sub-address from the request; comparing the sub-address received with a list of sub-addresses, each corresponding to a referring entity; and determining the referring entity corresponding to the request for an address based on the comparison.

(Verma at col. 3, ll. 1-15.) Kent further concludes that the "comparing step" in Verma calls for a "look-up function quite similar to the block of IDs correlating method in the '660 patent." (Kent Report at ¶ 191.) But Kent does not explain why, if at all, he believes that this renders the '660 Patent obvious. The '660 Patent does not claim an invention in "correlating" in general, much less in the abstract idea of "comparing."

- 29 -

Finally, as with Ross, there is no indication that Verma is directed at the same problem as the '660 Patent or is even relevant to that problem. Rather, Verma addresses "a need…to provide reliable measurement of advertisement effectiveness on the Web when using third party advertising agencies." (Verma at col. 2, ll. 64-67.) Furthermore, Verma is related to the field of "computer networks" (*see id*. at col. 1, l. 10) and does not appear to have any direct application to online affiliate networking.

Kent also claims that Graber '860 discloses a correlating function which renders the '660 Patent obvious. But Graber '860 is completely unrelated to webmaster affiliate systems. Graber '860 discloses user software provided by a "co-marketer" of an "On-Line Service", or "OLS". (Graber '860 at col. 4, ll. 61-65.) The OLS "represents a computer service such as, for example, an information retrieval service, a travel reservation service, or a stock trading service…" (*Id.* at col. 4, ll. 39-41.) When a computer user clicks on an advertisement for the OLS, a "special destination URL" is formed which has two parts. (*Id.* at col. 5, ll. 35-37.)

> "The first part of the destination URL is formed of the URL associated with OLS site 128 (e.g., WWW.OLS.COMM). The second part of the destination URL is formed of a destination filename (e.g., INDEX.HTML) and a UNIX symbolic link (e.g., .backslash.CM1) that is prepended to the beginning of the destination filename by the co-marketer (co-marketer #1) associated with WWW site 122a. The symbol or code used to form the UNIX symbolic link (e.g., .backslash.CM1) inserted by co-marketer #1 at site 122a is uniquely associated with co-marketer #1 in system 100."

(*Id.* at col. 5, ll. 37-47.) Kent suggests that the designation for the co-marketer, *i.e.*, "CM1", is the equivalent of a source Webmaster unique identifier described in the '660 Patent. (Kent Report at ¶ 192.) This is wrong. Figure 1 of Graber '860 indicates each co-marketer acts alone; Graber '860 does not teach that co-marketers are part of a single virtual affiliate system of webmasters.

ES-CRAK 005272

Moreover, Graber '860 does not disclose the '660 Patent's correlation of unique source webmaster identifiers to unique target webmaster identifiers. Kent glosses over this requirement and attempts to portray the URL associated with the OLS site as a "target Webmaster ID": "[Graber '860] employs a correlation operation to credit those co-marketers with successful transactions." (Kent Report at ¶ 192.) But the OLS disclosed in Graber '860 has no existing affiliate system of webmasters, and therefore there is no target webmaster identifier to correlate with an identifier for a source webmaster.

In sum, Graber '860 does not disclose a virtual affiliate system, does not disclose a target merchant affiliate system, and does not disclose the correlation of a SID with a TWUID. Graber '860, like Ross and Verma, does not address the same problem as the '660 Patent and is lacking key components of that invention.

Also, Kent's discussion of "Graber" in connection with the second petition to make special is deceptive. (*See* Kent Report at ¶ 66). Kent claims that:

> "the applicants did not accurately describe U.S. Patent No. 5,712,979 to Graber, which is directed to a method and apparatus for tracking referrals on the Web. The applicants wrongly told the examiner that Graber does not teach a referral system for merchants to reach potential customers through referring webmasters. This is completely incorrect, as discussed below, the Graber patent discloses a complete referral and tracking system."

(*Id.*)

But "the Graber patent" "discussed below" is not U.S. Patent No. 5,712,979 to Graber, but rather Graber '860, which was not referenced in the petition to make special. (*See* Kent Report at ¶ 192). And, as correctly stated in the second petition to make special, Graber '979 does not "disclose, teach, or suggest Applicants' invention in that the system and method do not provide a referral system for merchants to reach potential

ES-CRAK 005273

customers through referring webmasters." Accordingly, there is no basis for Kent's opinion that the discussion of the "Graber" patent (*i.e.* Graber '979) referenced in the second petition to make special was misleading or described inaccurately.

In sum, there is no reason to believe that a person of skill in the art would have found these patents, with or without a combination with Old Xpays, to render the invention in the '660 Patent obvious.

**H.      None of the other prior art Kent identifies renders the '660 Patent obvious.**

Finally, I disagree with Kent's opinion that the '660 Patent would have been rendered obvious over any of the other prior art he discusses, with or without Old Xpays. None of those prior art references include the key innovations in the '660 Patent, and Kent does not provide the basis for his conclusion that "anyone of skill in the art could have created a virtual affiliate network without undue experimentation using readily available techniques." (Kent Report at ¶ 179.) I note that Kent again misrepresents the scope of the '660 Patent, which does not claim all "virtual affiliate networks," so it is unclear to me whether his conclusions are even relevant to the validity of that patent.

Kent claims that "virtual affiliate networks" were known in the art before the invention claimed in the '660 Patent. (*Id.* at ¶ 180.) In support, he cites traditional multi-level marketing models in which second-tier affiliates are compensated to recruit additional second-tier affiliates. (*Id.*) Kent provides no basis for his opinion that these prior art references would render the '660 Patent obvious, whether alone or in combination with other references. But I disagree with his conclusion that they do.

ES-CRAK 005274

Kent identifies several different traditional multi-level marketing programs as relevant prior art. Kent's first example is a "multi-tier" system operated by Be Free, Inc. (Kent Report at ¶ 180.) This system is an online version of a traditional multi-level marketing system:

> "Be Free will provide services to GeoCities to support a multi-level marketing program to be used with the Pages that Pay program. These services will enable a merchant to reward affiliates for their own sales, and for the sales of affiliates who they recruit to the program, and other affiliates subsequently recruited by those affiliates recruited by the affiliate. Be Free will create link-generation and reporting capabilities that will allow GeoCities affiliates and merchants to track activity and sales results of the program.

(*See* EPIC 024346). Similarly, Kent also discusses marketing systems such as Amway and Mary Kay Cosmetics for the principle that they disclose a multi-tier marketing system in which "affiliates would be paid a commission to recruit additional affiliates, and when those second-tier affiliates produced traffic that resulted in completed transactions, the first-tier affiliates would be paid an additional commission." (*Id.*)

But those multi-level marketing practices have essentially no relevance to the field of online affiliate networks which is the subject of the '660 Patent. Rather, they represent a business model for generating commissions from multiple "tiers" of affiliates. But the '660 Patent does not claim a multi-tier affiliate system where affiliates are compensated to recruit additional, second tier affiliates. Nor is there any reason to believe that one of skill in the art would have considered traditional multi-level marketing and compensation systems in connection with the implementation of an online affiliate network.

Kent next discusses an online posting by Mark Welch in support of the proposition that the "idea of a true virtual affiliate system, in which the second-tier

ES-CRAK 005275

affiliates did not have to enroll in the target affiliate network" was also known in the art before the '660 Patent. (Kent Report at ¶ 181.) But the Welch posting does not disclose any of the advances claimed in the '660 Patent. Rather, it clearly expresses a desire for the technology disclosed in the '660 patent: "presumably, any network might participate in any other network, so that there could be a series of 'tiers,' not just two tiers." Welch's use of the word "presumably" does not indicate that Welch has identified the technology, rather that he believes it is possible but has not identified a way to accomplish it. And the Welch posting further indicates that others have also expressed a need for an effective solution to the problem: "several people have expressed concern that it is difficult for someone running a banner exchange to participate in other ad networks, for two reasons: first, most ad networks simply prohibit it, and second, most ad networks do not provide any mechanism to 'track through' by individual sites." More importantly, nothing in the Welch post indicates that Welch (or anyone else) had identified any of the components of the invention disclosed in the '660 Patent by the time of the posting.

Finally, Welch's post appears to be searching for a business solution—not a technological solution. He discusses unresolved issues with sharing commissions and asks whether his post reflects a potential "business opportunity." I note that Welch's understanding of the way commissions work in connection with a virtual affiliate system is simply wrong—it is not the case that the merchant's commission remains the same and each "tier" takes a smaller portion. Rather, the merchant generally has to pay a higher total commission in connection with offers distributed across a virtual affiliate network. There is no reason to believe that one skilled in the art would have combined Welch's post with any other prior art to render the '660 Patent obvious.

ES-CRAK 005276

Kent specifically claims that one of skill in the art would be able to combine the "idea" of a "virtual affiliate system" with U.S. Patent No. 5,991,740 to Messer to create the invention claimed in the '660 Patent. (Kent Report at ¶ 186.) But there is no reason to believe that is the case or that such a combination would render the '660 Patent obvious.

Messer has nothing to do with webmaster affiliate systems. Messer discloses a method for monitoring transactions which involves three websites. The first is operated by a "Content Provider" or "Site Owner" and includes "one or more web pages having information that is of interest to USERS" (*i.e.*, people browsing the Internet). (Messer at col. 4, ll. 37-41.) The second is operated by a "Merchant" with "specific goods…made available for purchase." (*Id.* at col. 4, ll. 60-62.) The third is operated by a "Clearinghouse", whose server

> "is programmed to communicate with the Merchants and Site Owner (many of them simultaneously are expected to be online) to facilitate the tracking and accounting associated with the successful Merchant based transactions."

(*Id.* at col. 5, ll. 5-9; *see also* Fig. 1.) In the Messer system, a user visits the website of a Site Owner and clicks on a banner advertisement, which is linked first to the Clearinghouse and then to the Merchant. (*Id.* at col. 5, ll. 17-26.) Messer discloses the use of an "identifier query string" or a web browser cookie to "permit tracking of the USER by the Merchant and Clearinghouse [and] determine if and when the USER was involved in a purchase." (*Id.* at col. 5, ll. 28-31.) Messer does not disclose an affiliate pool of source webmasters operating within a "virtual affiliate" system, as does the '660 Patent. Nor does Messer disclose the use of source webmaster identifiers or target webmaster identifiers; accordingly, there is no correlation as disclosed in the '660 Patent.

ES-CRAK 005277

Finally, Kent's characterization of Messer in connection with the second petition to make special is highly misleading. Kent claims that the second petition to make special misrepresented Messer because it "wrongly told the examiner that the tracking system in Messer is based on a user identification code, not an identification code for the referring Web site." (Kent Report at ¶ 65.) But Messer discloses a system for tracking users, not websites, which is exactly how it was represented in the second petition to make special. Kent's only support for his position appears to be that Figure 6 in Messer includes a reference to the term "Site (I.D.)" But the reference to "Site I.D." refers to the use of a cookie for tracking a user. (Messer at col. 9, ll. 1-5.) The use of cookies for tracking in the prior art was clearly disclosed as prior art in the '660 Patent, which defined "Cookies" as:

> "A technology that enables a Web server to retrieve information from a user's computer that reveals prior browsing activities of the user. The informational item stored on the user's computer (typically on the hard drive) is commonly referred to as a 'cookie.' Many standard Web browsers support the use of cookies."

('660 Patent at col. 6, ll. 59-64.) I see no reason to believe that the tangential reference to cookies in Messer is any different than the express disclosure of them as prior art in the '660 Patent. Furthermore, while Kent claims expertise in various fields, including online affiliate marketing, I see basis for his implied claim to expertise in the subject of patent prosecution or the impact of any statement on a patent examiner.

Kent further discusses several "readily available techniques," including link generation, URL tracking, and Web page scripting, which he claims that one of skill in the art would have used to provide "a means of tracking transactions in a virtual affiliate system." (Kent Report at ¶ 187.) In support, Kent cites his own books (*id.* at ¶ 188), the ClickTrade affiliate system (*id.* at ¶ 189), Verma (*id.* at ¶ 190), and another U.S. Patent to

ES-CRAK 005278

Graber, No. 5,712,979, (*id.* at ¶ 192) as disclosing URL tracking systems predating the '660 Patent. But the '660 Patent does not claim an invention in any of those prior-art building blocks and expressly identifies them as among the tools one of skill in the art would deploy to implement the claimed invention.

As discussed above, I disagree with Kent's opinion regarding the invalidity of the '660 Patent on the basis of obviousness. Additionally, I understand that courts consider several indicia of nonobviousness, including: (1) evidence of criticality or unexpected results, (2) commercial success, (3) long-felt but unresolved need, (4) failure of others, and (5) skepticism of others. Based on my experience in the affiliate marketing industry, I believe that each of these factors contradicts Kent's conclusions and confirm that the invention claimed in the '660 Patent is not obvious.

First, there is significant evidence of criticality or unexpected results. The ability to connect an existing pool of source webmasters with a wide variety of existing merchant affiliate networks using the correlation techniques disclosed in the '660 Patent resulted in phenomenal, unexpected growth in the online affiliate marketing industry. I have identified several factors contributing to this growth. First, the flexibility provided by the various correlation methods disclosed in the '660 Patent permitted an affiliate pool to simultaneously engage in virtual affiliate pooling with a range of existing merchant affiliate systems, each with different requirements. Second, it was no longer necessary to manually prepare and host intermediate pages, as had been done in the Old Xpays system, for example. Third, it provided the ability to dynamically adjust the destination to which traffic from existing advertisements would be redirected without distributing new links to affiliates, thereby permitting optimization on a nearly real-time basis or at least

ES-CRAK 005279

allowing more profitable offers to be promoted without changing links that had already been published by webmasters. Fourth, as the first three factors resulted in the gradual and informal adoption of the invention in the '660 Patent throughout the industry, it became increasingly easier for affiliate pools to offer each other's campaigns to their own respective pools of source webmasters and merchants increasingly understood that their affiliate systems needed to be compatible with the virtual affiliate pooling systems operated by the majority of affiliate networks. Most importantly, the simultaneous occurrence of these factors resulted in a positive feedback system which caused the phenomenal and unexpected growth in the industry.

Second, the technology claimed in the '660 Patent resulted in unprecedented commercial success for online affiliate networks which practiced it. The various affiliate pooling techniques claimed in the '660 Patent became the predominant method of online affiliate networking during the course of 2002 to 2004. Many billions of dollars have been generated from the use of the affiliate pooling technology disclosed in the '660 Patent. Perhaps as importantly, the online affiliate networking market became incredibly vibrant because the unprecedented scalability, modularity, and flexibility provided by the correlation techniques disclosed in the '660 Patent lowered the barriers to entry. As a result, hundreds of affiliate networks were able to participate in this online marketplace over the following decade, and new entrants in the market were able to challenge, and in many cases displace, the existing competitors.

Third, the technology disclosed in the '660 Patent satisfied a long-felt but unresolved need. I should note that in the rapidly changing and advancing context of the online affiliate network industry in the late 1990s, even a few months was a relatively

ES-CRAK 005280

"long" time. At that time, many networks were struggling with how to grow more quickly by adding additional merchants, which is a prerequisite to attracting additional affiliates, and vice versa. At that time, there was no readily available means for quickly adding new merchants with a variety of different tracking mechanisms in a scalable way. I note that the Welch post cited by Kent, which was dated only weeks before the invention of the technology claimed in the '660 Patent, confirms the existence of a need for such a scalable virtual affiliate system and that such a solution was not yet available.

Fourth, others appear to have failed at achieving the benefits provided by the virtual affiliate pooling technology claimed in the '660 Patent. The major affiliate networks at the time failed to achieve the scope and revenue achieved by later participants who adopted the claimed correlating techniques.

Fifth, in my experience, experts in the affiliate marketing field were highly skeptical of the benefits of the invention claimed in the '660 Patent. Specifically, they insisted, mistakenly, that virtual affiliate pooling would result in a lower cut for the webmaster. I note that Welch appears to have believed this at around the time of the invention of the technology. And Kent still believes this, despite over a decade of evidence in the industry to the contrary. But it is generally not the case—the kind of affiliate pooling made possible by the '660 Patent has not resulted in lower commissions to affiliates. To the contrary, the benefits of the technology to merchant affiliate systems—*i.e.* ready access to large existing pools of source affiliates—have resulted in merchants paying a premium commission resulting in the same payout to an affiliate in addition to a commission for the affiliate pool. Kent is not the only "expert" to have resisted this economic reality. It took several years before the general skepticism towards

ES-CRAK 005281

this model diminished enough for the industry to begin adopting it widespread starting in 2002 through 2004, after which it became dominant and its benefits could no longer be ignored.

## IV.     Facts or Data Considered

This report is based on my personal expertise and experience, and the following materials, all of which are hereby incorporated by reference: (1) U.S. Patent No. 6,804,660; (2) Expert Report of Peter Kent on the Validity of the Patent-In-Suit and the exhibits thereto; (3) the transcript of my depositions, both personally and as a representative of Essociate, Inc., from January 6, 2010, and October 8 and 9, 2012; (4) the alleged prior art cited in this report.

## V.     Compensation

I am the Chief Technology Officer of Plaintiff Essociate, Inc. However, I am not receiving any direct compensation for my study and testimony in this case.


DATED this 24th day of December, 2012.


Michael Landau

ES-CRAK 005282